**Tora C. BRENNAN, Plaintiff,**

v.

**MIDWESTERN UNITED LIFE INSURANCE COMPANY, a Corporation, Defendant.**

**Civ. No. 1716.**

United States District Court
N. D. Indiana,
Fort Wayne Division.
June 26, 1968.

Charles B. Feibleman and Sidney Mishkin of Bamberger & Feibleman, Indianapolis, Ind., Robert L. Kaag of Congdon & Kaag, Fort Wayne, Ind., for plaintiff.

G. R. Redding and John L. Woolling of Baker & Daniels, Indianapolis, Ind., Gilmore S. Haynie of Livingston, Dildine, Haynie & Yoder, Fort Wayne, Ind., for defendant.

## MEMORANDUM OF DECISION AND JUDGMENT

ESCHBACH, District Judge.

This is a class action in which the plaintiff and members of her class seek damages against the defendant corporation for allegedly aiding, abetting, and assisting a securities dealer in the alleged violation by the securities dealer of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and of Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. § 240.-10b-5. This court has jurisdiction under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78aa.

In an order entered September 23, 1966, which is reported at 259 F.Supp. 673, this court denied, inter alia, the defendant's motion to dismiss plaintiff's complaint for failure to state a claim upon which relief could be granted. No good purpose would be served by repeating in detail here the matters discussed in that order. At that time the court, considering only the complaint and motion to dismiss, held, first, that it could not be said that civil liability could never under any circumstances be imposed upon persons who do no more than aid and abet a violation of Section 10(b) and Rule 10b-5. The court held,

second, that there might be circumstances under which a person or corporation may, by merely failing to take action, give the requisite assistance or encouragement to a wrongdoer so as to constitute an aiding and abetting. The court then held that the pleadings presented to the court contained a sufficient basis to permit evidence that might establish conduct which under the circumstances would constitute an aiding and abetting. The principles discussed in that order are applicable to the facts disclosed by the evidence, and, to the extent they are relevant, they are incorporated herein by reference.

A trial was held to the court, without the intervention of a jury, beginning January 3, 1968. The court has concluded, after full consideration, that the plaintiffs have shown conduct on the part of Dobich Securities Corporation which constituted a flagrant violation of Section 10(b) and Rule 10b-5. The court has also concluded that the plaintiffs have shown affirmative conduct on the part of the defendant which, under the facts and circumstances of this case, constituted an aiding and abetting of Dobich's violation for the purpose of obtaining a benefit for the defendant. This aiding and abetting caused the losses sustained by the named plaintiff and those members of her class who purchased shares of stock in the defendant corporation on or after December 1, 1964 from Dobich Securities Corporation and did not receive delivery of the shares.

In its order denying defendant's motion to dismiss, this court said in part:

"This is not to hold that silence and inaction under all circumstances, or even under the circumstances which may be developed from the evidence in this case, constitutes aiding and abetting. This is merely to find a sufficient basis in the pleadings to permit evidence that may establish conduct which under the particular circumstances does constitute aiding and abetting. * * *" 259 F.Supp. at 682.

The correctness of that holding is now clear, because the evidence discloses *affirmative conduct* on the part of the defendant which constituted an aiding and abetting of Dobich's violation of the Securities Exchange Act of 1934. Therefore, it has not been necessary to the holding of the court to decide whether mere "silence and inaction" under the unusual circumstances of this case constituted aiding and abetting which caused the alleged damages. However, since under the evidence and the law the defendant's failure to report would constitute an independent basis of recovery and the parties have extensively briefed this question, it has been given consideration in this opinion.

Prior to the trial of this case, the parties entered into extensive discovery and voluminous stipulations. When the trial commenced, both sides were well aware of the evidence upon which each side has based its claims or defenses. If in any respect the pleadings do not strictly conform to the evidence, no prejudice to either side could have resulted therefrom.

The class of plaintiffs in this action, of which the plaintiff Tora C. Brennan is a member, claim to have purchased from Dobich Securities Corporation, and to have paid for, shares of common stock of the defendant, Midwestern United Life Insurance Company (hereinafter MULIC). The purchases involved in this action were in the secondary market for MULIC shares; that is, the market for shares already issued and outstanding. Throughout the period of time which is involved in this lawsuit, MULIC acted as its own transfer agent. The plaintiffs in this action claim that they never received from Dobich the shares of MULIC stock which they purchased and paid for. The Dobich Securities Corporation filed a petition in bankruptcy July 14, 1965. The bankrupt's insolvent estate is worth but a small fraction of the value of the shares in MULIC which Dobich sold but failed to deliver. The claims involved in this lawsuit are al-

leged to involve 419 individuals who claim losses totaling $2,104,904.75. However, as previously indicated, only a portion of plaintiff's class will be entitled to recover—those who purchased on or after December 1, 1964.

The Dobich Securities Corporation was formed October 16, 1963, as successor to a sole proprietorship run by one Michael Dobich and known as the Dobich Securities Company. ("Dobich" as hereinafter used will refer to either or both Michael Dobich and Dobich Securities Corporation.) The Corporation was registered as a broker-dealer with the Indiana Securities Commission, but not with the United States Securities and Exchange Commission.

The method of operation of the Dobich Securities Corporation and its predecessor was to concentrate its sales efforts in the secondary market for the common shares of one particular life insurance company. Thus, the corporation or its predecessor concentrated first in the stock of Bankers Life Insurance Company, then Wabash Life Insurance Company, then First United Life Insurance Company, and finally, beginning in the spring of 1964, MULIC. The general procedure followed by the corporation was to solicit orders for a particular stock through a staff of salesmen and to accept payment for these shares, either in cash or in the form of other securities, before actually purchasing the shares for delivery. This pattern of selling a share which the corporation did not yet own is known as a "short sale." Delivery of shares pursuant to these orders was made in numerous instances, after varying periods of delay, by purchasing the shares in the over-the-counter market.

The funds which Dobich Securities Corporation acquired through these "short sales" were applied predominantly in three ways: Payment of operating expenses, speculation in corporate securities for Dobich's own account and in his own name and speculation in commodities, also for Dobich's own account. The results were disastrous. Between Jan-

uary 1, 1964 and July 14, 1965, the corporation paid approximately $615,000 in commissions, plus a salary and "officer's commission" to Michael Dobich totaling $167,000. Operating expenses as a whole totaled $992,000. Speculations in corporate securities during this period for Dobich's own account produced a net excess of losses over gains of at least $465,000. Speculations in commodities during this period, with the funds of Dobich's customers but for Dobich's own account, produced a loss of $224,000. In addition, the short sale transactions in the stock of the various life insurance companies in which Dobich specialized also produced substantial losses—$140,000 in Wabash Life, $189,000 in First United Life, and $109,000 on the 48,409 shares of MULIC which Dobich actually did deliver. Dobich Securities Corporation produced during its short lifetime actual estimated liabilities of $2,700,000 and assets, other than insurance proceeds, of only $228,942. In all, Dobich failed to make delivery on short sales of approximately 36,000 shares of MULIC, for which customers paid Dobich approximately $2,900,000.

Even if all the assets of the Dobich Securities Corporation are accepted at the values given on the corporation's financial statements, the corporation was insolvent in the sense that its liabilities exceeded its assets as early as March 31, 1964. On that date it had a deficit net worth of $92,000. By August 31, 1964, the deficit had grown to $479,000, again assuming that all the assets stated on the balance sheet were worth what the statement claimed them to be worth. By December 31, 1964, the deficit net worth was $1,600,000. By July 14, 1965, the deficit was approximately $2,500,000. Growth in the balance of short sales (that is, sales of securities the corporation had not yet purchased) was equally spectacular. Short sales grew from $303,245 on January 1, 1964 to $875,985 on March 31, to $2,246,320 on August 31, to $2,529,710 on December 31, and finally to $3,142,842 on July 14, 1965.

To summarize, the Dobich Securities Corporation was in deep financial difficulties as early as March 31, 1964, and possibly much earlier. In what appears now to have been a desperate effort to recover, Dobich made short sales of MULIC stock in enormous quantities and used the proceeds in stock and commodity speculations for his own account, which only drove the corporation deeper into debt. Michael Dobich was killed in a helicopter crash on July 10, 1965, and the petition in bankruptcy of Dobich Securities Corporation was filed on July 14, 1965.

As might have been expected with such an enormous balance of short sales, the length of time which Dobich Securities Corporation required to make delivery of stock certificates was much greater than normal or customary. Dobich salesmen offered various explanations to customers. These explanations originated at sales meetings and were given to the salesmen by Jack Kitzmiller and A. J. Moore, two sales employees of the Dobich corporation, and occasionally by Dobich himself. In addition, the corporation sent out a large number of letters in the United States mails and telegrams which, inter alia, offered explanations in regard to slow deliveries. A typical letter to a purchaser of MULIC stock in the early fall of 1964 would acknowledge the purchase and promise delivery in four to six weeks. Some of the persons who received those letters but who did not receive their stock prior to October 24, 1964, received telegrams from Michael Dobich urging the purchaser not to be alarmed about lateness of delivery and promising a letter of explanation. About October 31, 1964, the telegrams were followed by letters. In these letters Dobich said,

"Our initial step in this endeavor has been accomplished and we can now revert to catching up on the details. You may not have received your certificate as yet; if not, it will be coming."

Those who purchased MULIC stock from Dobich after October 23, 1964 received letters which did not make any specific promise as to the date of delivery. They did contain this paragraph:

"Please do not become alarmed if delivery is made later than usual because we are creating a heavy interest in this particular stock. The unusually large volume has two effects; it makes our processes a little slower and at the same time, it causes your holdings to increase in value. * * * "

In general, these letters and telegrams reveal a substantial effort to mislead Dobich's customers by lulling them into a false sense of security. They were led to believe that late delivery was merely a product of administrative difficulties. Purchasers were not told that Dobich did not own the particular shares they were purchasing, that Dobich had a tremendous balance of short sales of MULIC stock, or that Dobich was insolvent. Such information under the circumstances then existing would obviously have been highly material to any purchaser from Dobich. In conducting these activities, Dobich used the United States mails, interstate Western Union Telegraph Facilities, and facilities of national securities exchanges.

Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, makes it unlawful for any person,

"by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

By the authority of the above section, the Securities and Exchange Commission has

promulgated its Rule 10b-5, 17 C.F.R. § 240.10b-5, which provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

It is completely clear that the course of conduct engaged in by Dobich Securities Corporation throughout the period of its dealings in MULIC stock constituted a flagrant violation of the above provisions.

■ It is now well established that a securities dealer who does business with the public, even at arm's length, impliedly represents that he will deal fairly with the public. 3 Loss, Securities Regulation 1483 (2d ed. 1961). See Charles Hughes & Co., Inc. v. SEC, 139 F.2d 434 (2d Cir. 1943) cert. den. 321 U.S. 786, 64 S.Ct. 781, 88 L.Ed. 1077 (1944). This implied representation of fair dealing is sometimes known as the "shingle theory."

Dobich Securities Corporation violated this implied representation of fair dealing in several ways. It engaged in transactions with customers while insolvent and without disclosing this crucial fact to its customers. This fact, without more, renders the sale of MULIC stock by Dobich under the facts of this case a violation of Section 10(b) and Rule 10b-5. In the Matter of Fliederbaum, Mooradian & Co., SEC Sec.Exch. Act Rel. No. 7176 (Nov. 29, 1963), CCH Fed.Sec.L.Rep. (1961-1964 Transfer Binder) ¶ 76,951. See SEC v. Universal Service Association, 106 F.2d 232 (7th Cir. 1939), cert. den. 308 U.S. 622, 60 S.Ct. 378, 84 L.Ed. 519 (1940); SEC v. C. H. Abraham & Co., 186 F.Supp. 19 (S.D.N.Y. 1960); 3 Loss, Securities Regulation 1508 (2d ed. 1961). In addition, Dobich failed to disclose to its customers the tremendous short interest it had built up in MULIC stock, a factor which if disclosed might have influenced customer evaluations of Dobich's recommendation to buy MULIC and customer decisions to make their MULIC purchases from Dobich. See 3 Loss, Securities Regulations 1504 (2d ed. 1961). Also, Dobich failed to disclose, prior to completion of sales to customers, its intention not to execute the orders and deliver the shares within the period customary in the industry. This disclosure, too, undoubtedly would have influenced customer decisions. See Bromberg, Securities Law: Fraud 94 (1967); 3 Loss, Securities Regulation 1488 (2d ed. 1961). Cf. Stephens v. United States, 41 F.2d 440 (9th Cir.), cert. den., 282 U.S. 880, 51 S.Ct. 84, 75 L.Ed. 777 (1940). In cases where Dobich did disclose that delivery would be later than usual, the disclosure was not made until after the customer had placed his order and paid his money. All of these failures to disclose constituted a course of conduct in flagrant violation of Dobich's implied representation, upon which the public relied, that Dobich would deal fairly with the public.

The Securities and Exchange Commission has given explicit recognition to these principles. Sec.Exch.Act Rel. No. 34-6778 (April 16, 1962), 27 F.R. 3991, CCH Fed.Sec.L.Rep. ¶ 22,696. This release declares that the Commission considers it to be a violation of, inter alia, Section 10(b) and Rule 10b-5 for a dealer not to clearly disclose prior to the sale its intention not to deliver the security promptly. The Commission's interpretation of Section 10(b) and Rule 10b-5 is clearly appropriate in the public interest and for the protection of investors within the standard set down by

Congress in Section 10(b). This interpretation of Section 10(b) and Rule 10b-5 gives effect to the Congressional purpose of outlawing fraudulent conduct in the sale of securities by requiring full disclosure of matters which the customer might consider material, and thereby preventing the dealer from taking unfair advantage of the customer's lack of information.

In addition to Dobich's repeated violations of its implied representation of fair dealing, Dobich engaged in a continuing effort through letters and telegrams to induce purchasers of MULIC stock not to inquire into the causes of late delivery. Dobich attempted to forestall inquiry by deliberately misrepresenting that the lateness in delivery was merely a product of administrative difficulties.

This court held in its opinion denying defendant's motion to dismiss, 259 F. Supp. at 680, that civil liability for violations of Section 10(b) and Rule 10b-5, under the doctrine of Kardon v. National Gypsum Co., 69 F.Supp. 512 (E.D. Pa. 1946), must be grounded upon general principles of tort law. In Tcherepnin v. Knight, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), the Supreme Court, speaking with reference to a claim for civil relief for violations of Section 10(b) and Rule 10b-5, held that " * * * The Securities Exchange Act quite clearly falls into the category of remedial legislation." 88 S.Ct. at 553. It appears clear therefore that the courts should maintain the same alertness to provide remedies for violations of Section 10(b) which the Supreme Court found in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) to be necessary to carry out the Congressional purpose in enacting Section 14(a) of the same Act.

The concept of aiding and abetting, as it has evolved in the law of torts, has been formulated in a most helpful manner in the Restatement of Torts § 876 (1930), which provides in part:

"For harm resulting to a third person from the tortious conduct of another, person is liable if he

\* \* \* \* \* \*

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself. \* \* \* "

After a careful and exhaustive consideration of the evidence in this case, the court finds that MULIC engaged in an affirmative course of conduct which aided and abetted Dobich's violations of Section 10(b) and Rule 10b-5.

To understand why MULIC's conduct was a substantial assistance and encouragement to Dobich, it is necessary to examine in substantial detail the relationship between MULIC and Dobich as it developed beginning in May of 1964.

The first significant contact between Dobich Securities Corporation and any officers or employees of MULIC came as a result of a telephone call sometime in mid-May of 1964 from F. H. Dellwo, a MULIC shareholder, to Phil J. Schwanz who was then and now is president of MULIC. In this telephone call, Dellwo reported to Schwanz the essence of a conversation which Dellwo had with a salesman from Dobich Securities Corporation. In response to a request from Schwanz, Dellwo set down the substance of his conversation with the Dobich salesman in a letter to Schwanz dated May 19, 1964. In this letter, Dellwo told Schwanz that the Dobich salesman, a Mr. Robert D. Call, had represented to Dellwo these things: That Dobich "works one stock at a time"; that Dobich claimed credit for a recent increase in the price of Wabash Life Insurance Company; that the increase was over and Wabash would soon decline; that MULIC was then secretly negotiating an acquisition of First United Life Insurance Company; that Dobich Securities Corporation had acquired 1,000 shares of MULIC; that MULIC would soon enjoy an increase in price; and that in six months MULIC would "top out" at $135 per share (which

was at least $65 above its then current market price). In addition, the salesman quoted prices for both MULIC and Wabash Life which were well above the then current market.

Schwanz then discussed the contents of the letter from Dellwo with Ralph Sheets, who was then and now is full-time general counsel for MULIC and who is now a vice president of MULIC. Schwanz and Sheets determined that the Dobich salesman had misrepresented to Dellwo a number of things. First, Schwanz testified that he is sure they checked the stockholder ledger and learned that Dobich held no MULIC stock of record at that time. Dobich's stock ledger cards are in evidence as Plaintiff's Exhibit 7 and they confirm this. Second, MULIC had no specific plans at that time for acquisition of First United Life Insurance Company. Third, Schwanz and Sheets saw no reason to expect the price of MULIC to rise to $135 per share as had been represented to Dellwo. Finally, Schwanz and Sheets viewed as excessive the spread above the then current market price which Dobich apparently was seeking to obtain for MULIC stock.

Because of these apparent misrepresentations originating with Dobich, Schwanz and Sheets decided to contact the Indiana Securities Commission. They secured Dellwo's permission to use his letter. Then, on May 26, 1964, with Schwanz' approval, Sheets sent to the Indiana Securities Commissioner, Martin K. Edwards, a copy of the letter from Dellwo, together with MULIC's own letter explaining that the rumor of MULIC's acquisition of First United was without foundation and that Dobich's asking price for MULIC stock was well above the then current market. Sometime shortly after June 2, 1964, Sheets received a copy of a letter sent from Thomas Mote, Deputy Securities Commissioner, to Michael Dobich directing Dobich and his salesman, Robert Call, to answer the allegations contained in the letter to the Commission from Sheets.

On June 5, 1964, Sheets met Michael Dobich for the first time. Dobich came to Sheets' office at MULIC headquarters in Fort Wayne to obtain a copy of the letter which Dellwo had sent to Schwanz and which Sheets had forwarded to the Indiana Securities Commission. Sheets refused to give Dobich a copy of Dellwo's letter because he was unable at the time to secure Dellwo's permission. Dobich then left, without discussing anything else of significance. Sheets then wrote Dellwo, informing him of Dobich's visit.

On June 22, 1964, Thomas Mote, the Deputy Securities Commissioner, wrote Sheets and informed him of the outcome of an informal hearing which had been held with Dobich and Call on June 15. Sheets was informed that Dobich claimed he was no longer using the rumor concerning MULIC's acquisition of First United Life and that Dobich had been warned against the use of "rumors" and "unreasonable spreads." The closing paragraph of the letter read as follows:

"We sincerely appreciate your calling this matter to our attention, and if further irregularities arise, please contact us."

This letter came to Schwanz' attention. Both Sheets and Schwanz testified that they regarded the closing paragraph at the time primarily as a formality and gave no particular thought at the time to what "further irregularities" might consist of. Sheets was undoubtedly aware at the time that an unreasonably long delay in delivery would be an "irregularity."

A number of things should be noted about this Dellwo incident. First it made the president and general counsel of MULIC aware that Dobich might be planning a concentrated sales effort in MULIC stock. Second, Sheets and Schwanz learned of a series of misrepresentations about MULIC being made by a salesman for Dobich Securities Corporation. Third, Sheets and Schwanz reacted to these misrepresentations with an immediate letter to the Indiana Securities Commission. Fourth, knowl-

edge that MULIC had written the Indiana Securities Commission was of sufficient concern to Dobich to cause Dobich to visit the MULIC offices. And finally, both the MULIC officers and Dobich knew that MULIC's letter to the Securities Commission resulted in immediate attention.

During the period in question in this lawsuit, MULIC acted as its own transfer agent. Sometime on or shortly after August 10, 1964, MULIC received the first in what proved to be a long series of inquiries with regard to late delivery or nondelivery of MULIC shares purportedly sold by Dobich. This inquiry, dated August 10, came from Mr. and Mrs. Lucius M. Sheets and was directed generally to MULIC. The letter was received in the stock transfer department by Mrs. Margaret Grandstaff, who was a supervisor in the stock transfer department. She called the letter to the attention of Mr. Kent Wenbert, who until November of 1964 was employed by MULIC as head of the stock transfer department. The letter stated that Mr. and Mrs. Sheets (not to be confused with Ralph Sheets, MULIC's general counsel) had, on May 27, purchased 45 shares of MULIC stock from Dobich Securities Corporation, had paid for the shares, had been promised delivery in from four to six weeks, but had not as of August 10 received the certificate.

On August 11, 1964, Wenbert wrote a reply to Mr. and Mrs. Lucius Sheets in which he said that the shares had not yet been presented to MULIC for transfer and that Mr. and Mrs. Sheets might "check with the Indianapolis Board of Securities Dealers, if there is one." The shares were transferred to Mr. and Mrs. Sheets on the books of MULIC on August 21, 1964.

On August 21, Mrs. Mollie Frank called the MULIC offices to inquire about MULIC stock which she had purchased from Dobich, but which she not received. Mrs. Grandstaff told Mrs. Frank that the certificate had not yet been received for transfer. Mrs. Grandstaff then learned that the certificate was in the process of transfer at that time. So she prepared a letter to Mrs. Frank over Wenbert's signature, informing Mrs. Frank that the certificate was being sent that day to Dobich. The transfer was in fact completed August 21.

On that same day, August 21, Miss Thelma Alberring wrote to MULIC, indicating that she had purchased some MULIC shares on May 5, but had not yet received them. The contents of this letter as mailed did not reveal either the name of the broker or the number of shares purchased. On this letter, which was admitted into evidence as Plaintiff's Exhibit 13, there appears the language "110 shares from Dobich" in Wenbert's handwriting. Mrs. Grandstaff testified that she received two telephone calls with regard to this purchase, one from Miss Alberring and one from Miss Alberring's nephew. Mrs. Grandstaff learned from the nephew that the shares had been purchased from Dobich. For reasons that are not altogether clear, she assumed that the total number of shares purchased was 110, and she passed this information on to Mr. Wenbert. She also prepared a written reply to Miss Alberring which was sent over Wenbert's signature and which indicates that Miss Alberring was not yet a stockholder of record. On September 4, 1964, MULIC received a routine transfer letter from Dobich, and among the instructions in the letter was an instruction to issue 50 shares to Miss Alberring. The transfer was completed on September 14 without any inquiry into the difference between the 110 shares noted on Plaintiff's Exhibit 13 and the 50 shares in Dobich's instruction.

On September 24, 1964, MULIC received a letter from Phillip Irwin indicating that on August 13, 1964, he had purchased 645 shares of MULIC stock from Dobich Securities Corporation and that he had been told he would receive the certificate in three weeks. The letter indicated that Irwin had not yet received the stock. The letter came to Mrs. Grandstaff's attention, and she prepared for Mr. Wenbert's signature a reply indicating that the shares had not been

presented to MULIC for transfer. MULIC received stock for transfer to Irwin on September 29 and also received on September 30 another letter from Irwin indicating that Dobich had told Irwin the stock was on its way. The transfer to Irwin was completed on October 1.

Sometime prior to September 28, 1964, Sheets, MULIC's general counsel, and Wenbert had a discussion in which Sheets was made aware of the complaints which were coming in about Dobich. Sheets also learned that with the exception of the Irwin purchase, the shares had ultimately been delivered. Sheets discussed the matter with Mr. Schwanz and, in particular, Sheets and Schwanz discussed the contents of a letter which Sheets proposed sending to Dobich. In particular, they discussed the possibility that Dobich might be using his customers' money as working capital. On September 28, 1964, Sheets wrote Dobich a letter, the contents of which are very significant. It read:

"Dear Mike:

"On quite a number of occasions during the past few weeks, we have received telephone or written inquiries from persons who advised that they have purchased and paid for Midwestern United Life Insurance Company stock through your company but have not yet received their stock certificates. Subsequently, you have forwarded stock to us with transfer instructions to the persons who had previously contacted us.

"Your purchasers who are subjected to such delays many times feel that the delays are caused by Midwestern United Life, and we are thus harmed by your delays. It appears that you are using your clients' money as working capital, which should not be done. If we receive any further inquiries from persons who allege that they have paid you for stock which they have not yet received and which we have not yet received for transfer, we will have to bring this matter to the attention of the Indiana Securities Commission.

"Mike, we do not want to cause you any trouble; but if, for some reason, your firm should be unable to make good on its obligations to transfer MULIC stock after your clients have paid for it, they might feel that MULIC is somehow responsible. We do not want this to happen.

"If there is some reasonable explanation for these delays, please let us know.

"Sincerely yours,
"Ralph E. Sheets"

It is clear from this letter that by September 28 Ralph Sheets had learned enough about Dobich's activities to conclude:

(1) that Dobich was using his customers' money as working capital;

(2) that this conduct was improper; and

(3) that this conduct was potentially harmful to MULIC.

Knowing all of these things, Sheets wrote Dobich a letter in which he stated that if MULIC received *any* further inquiries regarding lateness in delivery, MULIC would inform the Indiana Securities Commission. It is obvious that when Sheets wrote this letter he was fully aware of his previous contact with the Indiana Securities Commission in connection with the Dellwo matter. The Dellwo matter was Sheets' only previous contact with Dobich, and Sheets must have had it in mind or he would not have addressed Dobich as "Mike." Consequently, when Sheets told Dobich that he would report to the Indiana Securities Commission, he must have known that this would cause Dobich at least as much concern as the Dellwo correspondence had caused Dobich.

True to expectation, Sheets' letter of September 28 brought an immediate response from Dobich. Dobich's reaction was the same as it had been in connection with the Dellwo matter—a desire for a

personal meeting. On October 2, Dobich wrote Sheets:

"Dear Ralph:

"This writing is in response to your letter of September 28, 1964. We have developed a substantial interest in your company. I would like very much to have a brief meeting with you and Mr. Schwanz, if available, sometime soon.

"I will phone you for a time that will be mutually agreeable to discuss your letter.

"Yours truly,
"Michael Dobich"

Schwanz and Sheets discussed this reply from Dobich. There can be no doubt from the record but that Schwanz got the message Dobich was trying to convey. He understood Dobich to be trying to persuade MULIC that Dobich was selling a lot of MULIC stock. It is extremely significant to note that this letter from Dobich came on the heels of a threat by MULIC to take action which might have put Dobich out of business. Thus, regardless of what attitude Sheets and Schwanz may have had toward Dobich, they knew that Dobich was trying to counter their threat with a representation that he, Dobich, was in a position to benefit MULIC.

On October 6, Claude Sheley, a MULIC agent, called Kent Wenbert and told Wenbert of a visit Sheley had just had with a Mr. Dennis Greenawalt at Greenawalt's store in Markle, Indiana. Sheley related that Greenawalt had purchased 100 shares of MULIC stock from Dobich the previous July, but had not yet received the certificate. Wenbert made a memorandum of Sheley's call, and by October 8 this memorandum had come to the attention of Sheets and Schwanz.

Following instructions from Schwanz, Sheets wrote another letter to Dobich, which Schwanz signed, relating the details of the Greenawalt inquiry and requesting that Dobich contact both Greenawalt and Schwanz. Coming as it did soon after Sheets' letter of September 28 and Dobich's reply of October 2, this letter clearly implied that Dobich had better come in soon with an explanation for his lateness in delivery or MULIC would do what Sheets had threatened in his letter of September 28.

A copy of this letter of October 8 to Dobich was retained in a file which was known as the "Michael Dobich File." This file was established in Mr. Sheets' office at the time of Sheets' letter to Dobich of September 28. It contained only those matters pertaining to Dobich which Sheets directly handled or of which Sheets received a copy. It did not contain all the materials which MULIC had concerning Dobich. These were not assembled until after Dobich died. There was no other specific file on Dobich within MULIC's offices prior to Dobich's death.

Shortly after Sheets sent his letter of October 8 to Dobich, Dobich telephoned Sheets and asked to see Sheets and Schwanz. A conference was arranged for October 12 at the general offices of MULIC in Fort Wayne, Indiana. The conference was held in Sheets' office. Schwanz was late in arriving for the meeting, but participated in most of it. Dobich was asked for an explanation for his lateness in delivery. Dobich explained that on some occasions he was having difficulty obtaining delivery from other brokers. The major explanation which Dobich gave was that he had been purchasing MULIC shares in large blocks and pledging them as collateral, and he was having difficulty getting the shares released once the loans were paid off with proceeds from sales. Both Sheets and Schwanz testified that they accepted this explanation. Schwanz asked Dobich whether he was "short" (that is, whether he was engaging in short sale transactions) and Dobich denied that he was short. Dobich then said that he was selling substantial amounts of MULIC stock. Schwanz said that did not matter, but he, Schwanz, wanted the practice of slow deliveries to be stopped. Although Schwanz testified that he believed Dobich's representation that he had large amounts of MULIC stock pledged as collateral, Schwanz also

testified that he regarded as "salesmanship" and did not believe Dobich's statement that he was selling large amounts of MULIC stock. Dobich was asked how far behind he was in deliveries of MULIC stock, and Dobich said that in two weeks he could be completely caught up. An understanding was then reached that if MULIC were to receive further inquiries about late delivery after two weeks had expired from the date of the meeting, the inquiries were to be referred to the Indiana Securities Commission by MULIC.

It is not clear who first suggested the two-week period. The preponderance of the evidence is that Dobich stated that he could be caught up in two weeks, and Sheets and Schwanz then insisted that he be caught up in two weeks or further inquiries would be referred to the Indiana Securities Commission.

The understanding which was reached at the October 12 meeting was confirmed in a letter dated October 13 from Sheets to Dobich. This letter read:

"Dear Mr. Dobich:

"This will confirm our understanding that within two weeks you will have caused Midwestern United Life Insurance Company stock to be transferred to any persons who have purchased such stock through or from you.

"If we receive information after two weeks from now that you are not making transfers to purchasers of MULIC stock within the normal time required of a broker to effect such transfers, we will have to refer future inquiries to the Indiana Securities Commissioner for suitable investigation.

"Sincerely yours,
"Ralph E. Sheets"

Copies of this letter were sent to Schwanz, the president of MULIC, and to Kent Wenbert, head of the stock transfer department.

Certain things about the meeting of October 12 must be noted. At the meeting Dobich did two things of significance. First, he tried to explain his lateness in delivery of MULIC stock as legitimate, and, second, he reemphasized

the statement in his letter to Sheets of October 2 that he was selling substantial amounts of MULIC stock.

In the months which elapsed between the Dellwo incident and October 12, the market price of MULIC stock rose substantially. Regardless of whether Sheets and Schwanz believed what Dobich said at the meeting of October 12, it must have been clear to Sheets and Schwanz that Dobich was trying to claim credit for the recent price increase. Schwanz plainly demonstrated his awareness of what Dobich was trying to do when he characterized Dobich's statements about selling MULIC stock as "salesmanship." In view of the fact, well known to all concerned, that the October 12 meeting resulted from a threat by MULIC to report what it knew to the Indiana Securities Commission, the inference is strong that it was clear to Sheets and Schwanz at the time of the meeting that Dobich was trying to convince MULIC not to precipitate another informal hearing by the Indiana Securities Commission. The inference is equally strong that Schwanz and Sheets knew that Dobich was trying to convince MULIC not to go to the Indiana Securities Commission regardless of whether they believed Dobich's explanation for his lateness in delivery.

Dobich did not get at the October 12 meeting all that he hoped for. Schwanz told him in plain language that regardless of how much MULIC stock Dobich was selling, Schwanz wanted delivery times to be normal. So an arrangement was worked out in which Dobich was to have two weeks to "get even with the board" or, in the words of Ralph Sheets, MULIC would " * * * refer future inquiries to the Indiana Securities Commissioner for suitable investigation."

There is considerable conflict in the evidence as to whether at that point in time Sheets and Schwanz intended to refer future inquiries directly to the Commission or to tell inquiring persons to go to the Commission themselves. As will be discussed later, they did not actually do either one. Up to this point Dobich knew only that in connection with

the Dellwo matter MULIC had gone directly to the Commission and that on September 28 MULIC had threatened to go directly to the Commission again. Thus, when Sheets wrote on October 13 that MULIC would "refer future inquiries" to the Commission, it is highly probable that Dobich understood MULIC to be saying it would go directly to the Commission as it had done before. And regardless of what their actual intentions were, Schwanz and Sheets must have known that Dobich would take the letter to mean exactly what it said. Thus, after the October 12 meeting Dobich still viewed MULIC as a problem to be reckoned with, and MULIC knew that Dobich still viewed MULIC in that fashion.

The fact that Dobich was trying to prevent MULIC from doing anything which might precipitate an investigation was one indication that Dobich's "explanation" for his late deliveries was spurious. Sheets and Schwanz should have been particularly on their guard against such false explanations in view of their expressed suspicion that Dobich was using his customers' money as working capital. The primary explanation which Dobich gave, that he was having difficulty securing the release of shares pledged as collateral, was hardly a persuasive one in view of what Schwanz and Sheets, as experienced businessmen, knew about such business practices. Moreover, if Schwanz and Sheets completely accepted Dobich's explanation, it is difficult to understand why they would warn him nevertheless that they would report him to the Securities Commission if his lateness in delivery continued. Despite their testimony that they accepted Dobich's explanation, the preponderance of the evidence produces the inescapable inference that Sheets and Schwanz still believed after the meeting that Dobich was "short," but hoped that in two weeks Dobich could be caught up.

If Sheets had any thought that Dobich might have been telling the truth at the October 12 meeting about his lateness in delivery, that thought was dispelled by two memoranda which came to Sheets from Kent Wenbert on October 15. One of these related a visit which Beryl J. Grose made to Wenbert. Grose told Wenbert that he had purchased 119 shares of MULIC stock from Dobich on July 3 and another 40 shares on July 7, but he had not yet received his stock despite two letters to Dobich. Grose told Wenbert that Dobich had said delivery would be delayed because Dobich did not want to "flood the market" with MULIC stock. All this information was in the memorandum from Wenbert to Sheets. The memorandum also indicated that Wenbert advised Grose to contact the Securities Commission in Indianapolis. The other memorandum related that A. M. Buscher had telephoned Wenbert. Buscher told Wenbert that he had purchased 50 shares of MULIC stock from Dobich on August 24, but had not yet received the stock. Buscher told Wenbert that the Dobich representative had said that "the stock was in inventory and any delay in its delivery would be the fault of Midwestern United Life." Sheets knew that the explanations for late delivery given to Grose and Buscher were contrary to the explanation Dobich had given the MULIC officers, Sheets and Schwanz. Sheets also knew that the explanation given Grose was absurd, and the explanation given Buscher was both false and harmful to MULIC.

Sheets testified that after reading these memoranda he still accepted Dobich's explanation about slow delivery which Dobich gave at the October 12 meeting, but " * * * I probably assumed that this was the easy [sic] for him to put the blame on us rather than to go through the intricacies of explaining his financial situation. * * * " From the evidence it is difficult to conclude that Sheets would have permitted Dobich to use a false explanation which harmed MULIC if Sheets thought that Dobich had a legitimate explanation which he could have used instead. It is more reasonable to conclude that Sheets knew Dobich was offering any explanation for slow delivery, however false, which he thought might be accepted. A

reasonable conclusion is that Sheets knew that Dobich was actually using his customers' money for his own purposes, but nevertheless saw fit to go through with the "two week" bargain which he and Schwanz had made with Dobich three days before.

The same day as Wenbert's two memoranda to Sheets, October 15, MULIC received yet another inquiry about slow delivery, this one from George Puetz. Mr. Puetz related that he had placed three different orders for stock in MULIC, the first of which was on June 11, but that he had not received any stock. The letter from Puetz made no mention whatsoever of Dobich, nor did it in any other manner identify the broker. The letter came to the attention of Mrs. Grandstaff, who consulted with Wenbert. She and Wenbert together wrote a reply, dated October 15, 1964, in which Puetz was informed that the stock had not been presented for transfer, and it was suggested that Puetz "contact the broker through whom these purchases were made." The reply mentions neither Dobich nor the Indiana Securities Commission. Blind carbon copies (which are copies sent without so indicating on the face of the original) of the reply were sent to Ralph Sheets and to Michael Dobich. No one, including Mrs. Grandstaff, Mr. Wenbert, Mr. Sheets, or Mr. Schwanz, could explain how it was determined that the stock had been purchased from Dobich, although Mrs. Grandstaff testified that she would not have sent Dobich a blind carbon without knowing somehow that Puetz had bought the shares from Dobich. One thing about this correspondence is clear. Whoever made the decision to send Dobich a blind carbon copy of the MULIC reply to Puetz, whether it was Sheets, Wenbert, or Mrs. Grandstaff, knew enough about the pattern of complaints regarding slow delivery to know that they were chiefly, if not exclusively, about Dobich. MULIC's failure to refer the Puetz inquiry to the Indiana Securities Commission was consistent with the understanding which had been reached in the meeting with Dobich three days before, and for that reason MULIC's notification of Dobich by way of a blind carbon copy in no way indicated to Dobich anything significant about the manner in which MULIC might handle inquiries coming in later.

On October 22, 1964, Mr. Schwanz received a telephone call from Orville Krieger, a broker who had in the past initiated some contacts with MULIC which had resulted in purchases of various businesses by companies associated with MULIC. In this telephone call Krieger informed Schwanz that the Illinois Mid-Continent Life Insurance Company of Chicago might be interested in a merger with MULIC. Negotiations were opened with certain officials of Illinois Mid-Continent (hereinafter referred to as IMC), and by October 28 a preliminary agreement had been reached on the terms of a proposed merger between MULIC and IMC. The merger was to be consummated on the basis of an exchange by IMC shareholders of ten shares of IMC stock for each share of MULIC stock. An agreement of merger was signed on November 5, based upon this ten-to-one ratio. On November 10, three dissident directors of IMC filed suit in the Circuit Court of Cook County, Illinois, to enjoin consummation of the merger. An extended proxy fight followed which culminated in a vote of IMC shareholders on February 4, 1965. The required two-thirds of IMC shareholders did not vote in favor of the merger, and the merger consequently was not consummated. Schwanz denied that the ten-to-one ratio of exchange of IMC shares for MULIC shares was based primarily on the market prices of the two stocks prevailing at that time. However, the preponderance of the evidence is clearly that this ratio was based primarily, if not exclusively, on prevailing market prices. During the fourth quarter of 1964, the approximate bid price of MULIC stock ranged from a low of $80\frac{1}{2}$ to a high of 93. During this same period the bid prices for IMC stock ranged from a low of $7\frac{1}{2}$ to a high of $11\frac{1}{4}$. Schwanz testified that to his best recollection the price

of MULIC during the IMC merger negotiations was in the "upper 80's" while IMC was selling at "between seven and eight." The bid and asked prices for the two stocks as reported in the Wall Street Journal were discussed during the negotiations. A letter sent to the shareholders of IMC on December 3, 1964 by the IMC directors who supported the merger emphasized the market prices of the two stocks, but did not mention book values at all. A similar letter sent on January 5, 1965 contained an underlined statement that "at current market prices the 10 for 1 exchange ratio is distinctly favorable to you and other holders of Illinois Mid-Continent." This letter also made no mention of book values. Sometime in December of 1964, Schwanz telephoned Theodore P. Beasley, Chief Executive Officer of the Republic National Life Insurance Company of Dallas. Schwanz gave Beasley some market quotations for MULIC and IMC stock and asked his opinion on the fairness of the merger. Schwanz received from Beasley a letter of opinion that, based upon the market quotations furnished by Schwanz, the merger terms were fair. In contrast to the ratio of approximately ten to one in market prices which prevailed during this period, the ratio of adjusted book values as of September 30, 1964 was approximately four to one or five to one, depending upon the formula applied. No meaningful basis for the ten-to-one merger ratio other than market value was suggested by the evidence. It is clear that consummation of a merger with IMC based upon the then prevailing market prices would have increased the post-merger book value of MULIC shares.

The ten-to-one ratio of exchange, which was the basis of the proposed IMC merger, depended upon the price of MULIC shares remaining in the upper 80's and low 90's during the negotiations and subsequent proxy fight. MULIC stock had only very recently achieved this price level. The price increase had put MULIC in a much more favorable position for mergers, and the prospects for successful consummation of the proposed

IMC merger depended upon having nothing happen which would drive the price of MULIC stock sharply or suddenly down. By November 10 MULIC knew that a proxy fight was developing among the shareholders of IMC. Public disclosure of Dobich's activities and of MULIC's knowledge of those activities would have been extremely embarrassing. Therefore, any change in MULIC's attitude toward Dobich after the beginning of negotiations for merger with IMC must be viewed realistically and in light of all the other circumstances then known. It must have been obvious to the president and general counsel of MULIC that stability of the price of MULIC stock at its recently attained level was an objective worth pursuing. Again the inescapable inference is that these men viewed Dobich's sales activities as a benefit to MULIC, and they elected to pursue this benefit.

There is abundant evidence that a very pronounced change in MULIC's attitude toward Dobich did in fact take place sometime between October 13 and November 30, 1964. This change in attitude was first disclosed *to Dobich* in connection with an inquiry from Robert Dillon. On or about November 23, 1964, MULIC sales agents Fred Johnson and Ralph Matthews called upon Dillon. Dillon told them that he had traded 1,549 shares of First United Life Insurance Company stock to Dobich in exchange for 200 shares of MULIC on September 10, 1964, but he had not yet received his MULIC shares.

Johnson called Schwanz from Dillon's office on November 23 and related to him the details of Dillon's purchase. On November 30, 1964, Sheets wrote Dobich as follows:

"Dear Mr. Dobich:

"We have been contacted by Mr. Robert E. Dillon, who advises that he purchased 200 shares of Midwestern United Life Insurance Company stock from you on September 10, 1964, at $82.00 per share and traded in 1,549 shares of First United Stock at $10.50.

He advises that to date he has not received his MULIC stock.

"We are suggesting to Mr. Dillon that, in the event he does not receive his stock immediately or does not receive a satisfactory explanation for the delay, he turn the matter over to his personal attorney and/or contact the Indiana Securities Commissioner.

"I hope it will not be necessary for him to take this action.

"Sincerely yours,
"Ralph E. Sheets"

Sheets sent a carbon copy of this letter to Dillon, along with another letter advising Dillon to consult an attorney or the Securities Commissioner *if* he did not hear from Dobich "right away." Sheets gave Dillon the name and address of the Securities Commissioner.

At the trial, Sheets was asked why he did not write to the Commissioner directly as had been done in the Dellwo matter. Sheets testified that it was his and Schwanz' intention to refer "inquiring persons" to the Commission, and his use of the word "inquiries" in his letter of October 13 to Dobich was inadvertent and should have been "individuals making inquiries." But the fact of the matter is that Sheets did not do either one. He referred Dillon to Dobich, and only secondarily to the Commission *in the event that Dobich did not then deliver.*

The significance of Sheets' letter to Dobich on November 30 is far greater than that it gave Dobich an opportunity to deliver to Dillon and keep Dillon away from the Securities Commission. It must be remembered that until this time, Dobich had no reason to think that if a complaint about late delivery came to MULIC, MULIC would do anything less serious (from Dobich's point of view) than forward the inquiry directly to the Indiana Securities Commission. It is reasonable to conclude that Dobich, until this time, had good cause to fear that MULIC might even take its whole history of complaints to the Commission. Dobich had tried at the October 12 meeting to convince Schwanz and Sheets that he was

worth protecting, but up until November 30 Dobich had no reason to suspect that his efforts had been successful. So it must have come as an extremely pleasant surprise to Dobich to learn that so long as he delivered Dillon's shares, MULIC would keep still. Nowhere in his letter did Sheets suggest that Dobich was appropriating his customers' money or that his conduct was improper or that Dobich was giving MULIC a bad name. In short, all the expressions of generalized concern about Dobich's activities, so evident in the letters of September 28 and October 13 and in the meeting of October 12, were gone. In their place was a letter indicating that so long as the *particular* complaint was satisfied, MULIC had no further concern.

As previously noted, the irresistible conclusion is that Sheets knew well before November 30 that Dobich's explanation about slow delivery was not truthful. As an intelligent and responsible businessman, he must have realized that there were others who had purchased shares from Dobich without getting delivery besides those who had complained to MULIC. And yet Sheets wrote Dobich a letter which, as Sheets well knew, fell far short of what MULIC had threatened to do in all its previous contacts with Dobich. Sheets must have known that Dobich would regard the letter as a substantial change in MULIC's position, a change that would enable Dobich to stay in business so long as he satisfied the complaints which came to MULIC. Dobich no longer had to "get even with the board" or risk being reported by MULIC. The change in MULIC's attitude which MULIC first made known to Dobich in Sheets' letter of November 30 was therefore a substantial and knowing encouragement to Dobich to continue his activities without fear of a report from MULIC to the Indiana Securities Commission.

From November 30 until Dobich's death in July of 1965, MULIC uniformly maintained the attitude, first made known to Dobich in the letter of November 30, that so long as the particular complaint coming to MULIC was satis-

fied, MULIC had no further concern. It did not take long for this new attitude to reflect itself in the stock transfer department. On December 1, 1964, a postcard addressed to Mr. Schwanz from Frederic E. Volkee arrived at the MULIC offices. Schwanz was in Chicago, so the card was referred to the stock transfer department, where it came to Mrs. Grandstaff's attention. The card related that Volkee had purchased MULIC stock from Dobich "many months ago" but had not received it. Mrs. Grandstaff discussed the matter with the new head of the stock transfer department, Max A. Roesler. She then sent a letter to Volkee over Roesler's signature, informing Volkee that the stock had not been received for transfer. The letter suggested that Volkee contact Dobich, and *if that did not help,* Volkee should contact his attorney or the Indiana Securities Commission. The letter then gave the address of the Indiana Securities Commission. It is interesting to note that the suggestions made in this letter were identical to those made in Sheets' letter to Dillon of the previous day. Both Sheets and Mrs. Grandstaff testified that the Volkee matter did not come to Sheets' attention at all.

Mrs. Grandstaff sent to Dobich a *blind carbon copy* of her letter to Volkee. She testified that she sent the blind carbon on her own initiative, although she was not sure why she did it. In response to a question from the Court, she testified that her procedure to send blind carbons of such letters to Dobich might have been precipitated by the meeting between Dobich, Sheets, and Schwanz on October 12. However, she also testified that at the time she first sent a blind carbon copy of such a letter to Dobich, on the occasion of the October 15 letter to George Puetz, she did not know of the October 12 meeting. How blind carbon copies of such letters came to be sent to Dobich remains an unexplained mystery.

Whoever sent to Dobich the blind carbon copy of the letter to Volkee, it is clear that the copy performed exactly the same function as Sheets' letter to Dobich of the day before. It disclosed to Dobich that Volkee was being advised in exactly the same manner as Dillon had been advised. Moreover, Dobich could scarcely have failed to notice that the problem of late deliveries was no longer a matter for treatment by the highest officers of MULIC, but rather, since a policy had been established, such matters were now being handled by the stock transfer department. So far as Dobich knew, the matter never ventured higher than the stock transfer department again. Sheets' letter of November 30 was the last direct communication Dobich received from either Sheets or Schwanz.

The communications of November 30 and December 1, 1964, from MULIC to Dobich constituted a substantial encouragement and assistance to Dobich in that they:

(1) indicated to Dobich that MULIC no longer intended to do what it had previously threatened to do, namely, report Dobich's conduct to the Indiana Securities Commission and

(2) indicated to Dobich that thenceforth MULIC would follow a procedure of referring inquiries to Dobich, thereby giving Dobich an opportunity to satisfy the complaint and thus prevent his customer from reporting to the Commission.

From November 30 until Dobich's death, Dobich did not receive one communication from MULIC which might have caused him to change his estimate of what MULIC was likely to do. Throughout the first half of 1965, until Dobich died, MULIC continued to take the view that so long as particular complaints which came to MULIC were satisfied, Dobich could be left alone. And with this assurance that MULIC was now going to help him rather than report him, Dobich continued to assume that so long as particular complaints which came to MULIC were satisfied, Dobich and his organization would be left undisturbed. And with this assurance, Dobich continued his fraudulent practices unabated.

On February 11, 1965, Schwanz received a letter from Charles Kankamp, a

MULIC shareholder, indicating that George Anstett, James Hanna, Kenneth Hanna, and Bill Hanna had purchased shares of MULIC from Dobich in mid-October 1964. The letter indicated that Kenneth and Bill Hanna had received their stock after a further inquiry directed to the Dobich salesman, but George Anstett and James Hanna had not received theirs. This letter came to the attention of both Schwanz and Sheets, but neither did anything about it except to refer it to Mrs. Grandstaff. Mrs. Grandstaff learned that James Hanna's shares had been transferred February 5. She called George Anstett and told him to call Dobich. She cannot recall whether she mentioned the Indiana Securities Commissioner. Anstett's stock was transferred on February 24.

On February 16, 1965, a MULIC agent, Robert Funk, called upon Schwanz' secretary, Miss R. A. Didier, and told her that a Mr. and Mrs. James Conrad of Waterloo had purchased MULIC stock in September of 1964 and had received it just during the past two weeks. The Conrads purchased 54 more shares in November, and Miss Didier learned from Mrs. Grandstaff that these shares had just been transferred February 15. Miss Didier put this information in a memorandum to Schwanz, who saw it but took no action because the memorandum indicated the shares had been delivered.

On March 8, 1965, J. H. Goddard & Co., Inc., a brokerage firm, sent telegrams to a large number of MULIC shareholders, recommending exchange of MULIC shares for those of another insurance company. Shortly thereafter, Schwanz learned of a number of these telegrams and, on March 12, Schwanz sent a letter to all MULIC's shareholders reviewing the year's progress and urging retention of MULIC shares. Plaintiff's Exhibit 39 discloses that the price of MULIC stock fell from a level of 90 bid, 92 asked on March 5 down to 79 bid, 82 asked on March 12. The price then rose somewhat to 83 bid, 86 asked on March 19 and then fell again to 72.4 bid, 74.4 asked on March 26.

Two days after the Goddard telegrams went out, on March 10, 1965, MULIC began serious negotiations for a merger with Great Northern Life Insurance Company. The merger which was ultimately negotiated with Great Northern was more closely related to the relative book values of the two companies than the IMC merger had been, although the relative market prices of the two stocks were taken into consideration. The merger was delayed somewhat in May or June of 1965 by the efforts of one George Snyder to collect a "finder's fee." The merger was finally consummated on July 26, 1965.

These events occurring in the early part of 1965 reveal a continuation of the attitude of MULIC officials toward Dobich which first became evident during the negotiations and proxy fight in relation to the proposed merger with IMC. Schwanz' reaction to the Conrad inquiry reveals that Schwanz no longer felt a need to take any action so long as the inquiry revealed that the shares had ultimately been delivered. Even if the shares had not to Schwanz' knowledge been delivered, Schwanz was content to let the stock transfer department handle it, as his treatment of the Kankamp inquiry shows. Schwanz' immediate reaction to the Goddard telegrams and the opening of negotiations for merger with Great Northern reveal that Schwanz was no less sensitive about the price of MULIC stock in the spring of 1965 than he had been in the fall of 1964. Exposure of Dobich's activities and public disclosure of MULIC's knowledge of those activities would have been no less embarrassing in the winter and spring of 1965 than in the fall of 1964.

Although further complaints of lateness in delivery continued to come to Schwanz, to Sheets, and to the stock transfer department, MULIC uniformly followed the practice of advising inquiring persons to contact Dobich *before* contacting the Securities Commission.

On April 8, 1965, Beryl Grose, who had made one complaint to MULIC the previous October 15, wrote to MULIC and

indicated that he had purchased 63 additional shares of MULIC stock from Dobich on March 4 and he was concerned about the 10% stock dividend which MULIC had declared for stockholders of record as of March 31, 1965. Mr. Roesler of the stock transfer department replied that the shares had not been received for transfer and payment of the dividend was therefore the broker's responsibility.

On April 12, 1965, Margaret E. Schriefer wrote to MULIC and stated that she had purchased ten shares of MULIC from Dobich the previous October, but had not yet received the certificate. Roesler wrote back on April 14 and said that the ten shares had not been received for transfer. The letter suggested that Mrs. Schriefer contact Dobich. Neither this letter nor Roesler's letter to Grose mentioned the Indiana Securities Commissioner. Neither exchange of letters came to the attention of Ralph Sheets. No instructions had been left with either Kent Wenbert or Max Roesler following the October 12 meeting with Dobich to call further complaints about Dobich to the attention of Sheets or Schwanz.

Sometime around April 14, Dennis Greenawalt, who had already complained about Dobich once the previous October 6, called Schwanz and said that he had purchased 50 additional shares of MULIC from Dobich on October 27, 1964, but he had not received the certificate. Schwanz passed the information along to Sheets, who wrote Greenawalt on April 14. Sheets informed Greenawalt that the additional 50 shares had not been received for transfer and suggested that Greenawalt contact Dobich and threaten to contact the Securities Commissioner *if he didn't receive the stock*. Sheets also gave Greenawalt the name and address of the Securities Commissioner. Neither Sheets nor Schwanz could explain why they advised Greenawalt to contact Dobich first, rather than having MULIC or Greenawalt contact the Commission directly, except to say that they thought this action would be sufficient to get Greenawalt his stock.

In April and May of 1965, MULIC received a series of letters from alleged purchasers of MULIC stock from Dobich which indicated that Dobich was still extremely slow in making deliveries. Briefly summarized, these letters included a letter dated April 21 from Dr. Richard S. Johns of Munster, Indiana, indicating a purchase of 90 shares of MULIC stock in August, 1964, for which delivery was finally accomplished with difficulty on March 31, 1965; a letter dated April 19 from Paul Hirsch, an attorney representing Dorothy Jane Martin and Verlyn Jay Martin, indicating a purchase of 110 shares on December 14, 1964, for which delivery was finally accomplished on April 23, 1965; a letter dated April 19 from Myron A. Phillips of Plymouth, Indiana, indicating a purchase of 16 shares on December 13, 1964, for which delivery was finally accomplished on May 12, 1965; a letter of May 3, 1965 from Galen Bowman indicating a purchase of ten shares on February 4, 1965, for which delivery was finally accomplished May 12, 1965; a letter dated May 5, 1965 from Mrs. Stephen Kalabany of South Bend, Indiana, indicating a purchase of 100 shares no later than the end of 1964 for which delivery was accomplished May 12, 1965; and a letter dated May 10 from Donald F. Crane of Loogootee, Indiana, indicating a purchase of MULIC stock from Dobich sometime before March 31, 1965 for which delivery was finally accomplished in June 1965. All of these letters were received and answered by Max Roesler in the stock transfer department. There is no evidence that any of them came to the direct attention of anyone at MULIC outside the stock transfer department.

Sometime in early May 1965, James Frank, an attorney in Union City, Indiana, telephoned Ralph Sheets, MULIC's general counsel, and said that his mother, Mrs. Mollie Frank (the same Mollie Frank who had telephoned the MULIC offices the previous August 21) had purchased some additional shares of MULIC stock from Dobich but had not received the certificate. Sheets advised Frank

to contact Dobich and *if Dobich didn't deliver*, to contact the Indiana Securities Commission. In a letter of May 10, Sheets again advised Frank to contact Dobich. The letter did not mention the Securities Commission. Frank went to Dobich's office, where Dobich instructed one of his employees to call MULIC and have them transfer additional shares to Mrs. Frank. Twenty shares of MULIC stock were transferred to Mrs. Frank on May 12.

On May 17, Dudley Campbell of Rushville, Indiana, wrote to Donald Grissom, first vice president, secretary, and a director of MULIC. He informed Grissom that he had purchased 123 shares of MULIC stock from Dobich on March 10 and another 100 shares on March 15, but he had not yet received the certificates. He told Grissom that Dobich had said MULIC's transfer department was slow. On May 19, Grissom replied to Campbell, telling him that the certificates had been mailed to Dobich on May 17.

The only other direct contact which Grissom had with the Dobich complaints came on May 20. On that date, Grissom received a telephone call from Frederick R. Postlethwaite, a stock broker in Indianapolis. Postlethwaite informed Grissom that one Ronald Mercer had purchased 100 shares of MULIC stock from Dobich some months previously but had not yet received the certificate. Postlethwaite put this information into a letter to Grissom dated May 24. Grissom discussed the matter with Sheets, who told Grissom that there had been other complaints of slow delivery about Dobich. Grissom told Postlethwaite to advise Mercer that Mercer should contact Dobich and/or report the nondelivery to the Securities Commission. Grissom later learned that the transfer to Mercer had been completed on June 4.

Early in June of 1965, MULIC life insurance sales agents Browne Gilbert and Fred Johnson called on William Richter at his office in Indianapolis. Richter told the agents that he still had not received the 40 shares of MULIC stock which he had purchased from Dobich in November. Gilbert and Johnson offered to call MULIC officials about it, and Johnson actually spoke to Schwanz about it. Gilbert then sent a copy of Richter's purchase order, Dobich's letter of acknowledgment, and Richter's canceled check to Schwanz. The letter of acknowledgment which Gilbert sent to Schwanz was typical of those Dobich sent to his customers after October 23, 1964. It contained the representation that Dobich was "creating a heavy interest" in MULIC stock, and it clearly stated that delivery would be "later than usual." Schwanz referred the matter to Sheets, and at that time the two discussed the possibility of consulting the Indiana Securities Commission. They did not do so, however. Instead, Sheets wrote a letter to Gilbert in which he told Gilbert to advise Richter to consult Dobich. Sheets told Gilbert to advise Richter that Richter should tell Dobich he would consult the Indiana Securities Commission and the United States Securities and Exchange Commission *if he did not receive immediate delivery*. Sheets testified that he did not then know that the Securities and Exchange Commission had jurisdiction over such matters. He considered mention of the Securities and Exchange Commission as another "pressure tactic" to use against Dobich. Gilbert advised Richter along the lines that Sheets had suggested.

On June 17, 1965, MULIC received a letter from W. Harry Bonifield of Warren, Indiana, informing MULIC that Bonifield had purchased 20 shares of MULIC stock from Dobich in January but had not yet received it. The letter came to the attention of Ralph Sheets who wrote a reply on June 21. Sheets informed Bonifield that the stock had not been received for transfer. The letter informed Bonifield that he would have to obtain the stock dividend of March 31, 1965 from Dobich. The letter did not otherwise make any suggestion as to how Bonifield should proceed in

getting his stock. The Indiana Securities Commission was not mentioned.

Sometime in June 1965, Robert Funk, a MULIC sales agent, told Mrs. Grandstaff that Leland Miller of Spencerville, Indiana, had sometime previously purchased MULIC stock from Dobich but had not received it. Funk requested that Mrs. Grandstaff check on it, write to Miller, and notify Dobich. On June 28, Mrs. Grandstaff wrote a letter over Max Roesler's signature, telling Miller that his shares had not been received for transfer. The letter suggested that Miller contact Dobich. It did not mention the Indiana Securities Commission. The letter indicated on its face that a carbon was sent to Dobich. Why Mrs. Grandstaff sent an open carbon copy in this case, whereas she sent blind carbon copies to Dobich in two previous cases, has not been satisfactorily explained.

On June 29, 1965, Mrs. Frank Gladden of Indianapolis called the MULIC offices and spoke to Ralph Sheets. She told him that in December of 1964 she and her husband had purchased stock in MULIC from Dobich, but that despite repeated requests to Dobich they had not received it. Sheets told her that MULIC had received a number of previous calls like hers, but that MULIC could do nothing about it. She was advised to *call Dobich* and "threaten to prosecute."

On July 8, 1965, Schwanz received a letter from Mrs. Evelyn Carson of Logansport, Indiana. Mrs. Carson informed Schwanz that she had purchased 63 shares of MULIC stock from Dobich in February and March of 1965, but that despite repeated efforts she had not received the certificates. The letter also informed Schwanz about an aunt of Mrs. Carson who was in a similar position. Schwanz instructed his secretary to have Ralph Sheets write a reply to Mrs. Carson and a letter to the Indiana Securities Commissioner. Schwanz' secretary took the Carson letter and these instructions to Sheets' secretary, Janice Vice (now Mrs. Janice Drake). Miss Vice then prepared a rough draft of a letter to Mrs. Carson and a rough draft of a letter to the Indiana Securities Commissioner, and placed these drafts, together with the Carson letter, on Sheets' desk. Sheets found these on his desk late in the afternoon of Friday, July 9. Sheets was planning to go to Indianapolis on Monday, July 12, in connection with the proposed merger with Great Northern Life Insurance Company. He testified that he planned to visit the office of the Securities Commissioner on Monday with the Carson letter and so he destroyed the two drafted letters which Miss Vice had prepared. In any event neither of them was ever mailed.

Dobich was killed the next day, Saturday, July 10. Sheets went to Indianapolis on Monday, July 12. He learned of Dobich's death sometime that day. He testified that he did not visit the Securities Commissioner on Monday because his work on the Great Northern merger occupied all his time.

After Dobich died, a number of additional complaints about nondelivery of MULIC shares purchased from Dobich came to the attention of both Sheets and Schwanz. One such complaint came in a telephone call from F. Robert Jennings, an Indianapolis businessman, to Schwanz on July 13, 1965. Jennings told Schwanz that he had purchased 30 shares of MULIC stock from Dobich on April 1, but that he never received the stock. Schwanz and Jennings differ as to what happened next. According to Jennings, Schwanz then said that he had considered "shutting [Dobich] off" but that he did not because he was afraid people might lose money. According to Jennings, Schwanz also said that it was unfortunate Dobich died because if he had lived he "might have pulled it off."

Schwanz and Sheets knew well before November 30, 1964 that Dobich was dealing in a fraudulent manner with his customers' money. Nevertheless, it is apparent that the MULIC organization consistently followed the practice of referring inquiring Dobich customers *first* to Dobich before referring them to the Indiana Securities Commission. Schwanz acknowledged that in each in-

stance of a complaint, the inquirer was referred first to Dobich. Moreover, Schwanz conceded in his oral testimony that referring an inquiring person to Dobich, and only after that to the Indiana Securities Commission, had the effect of giving Dobich an opportunity to make delivery and thus prevent the matter from reaching the Commission.

The Court recognizes that, as will be discussed, the Indiana Securities Commission received complaints about Dobich Securities Corporation regarding slow delivery. These complaints were similar to those which might have been written to the Commission had MULIC not followed the practice outlined above. The significance of *MULIC's practice was not* that it prevented Dobich customers from complaining to the Indiana Securities Commission. The significance of MULIC's practice was that it indicated *to Dobich* that MULIC would not, as it had previously threatened, *itself* report Dobich's activities. In addition, MULIC's practice indicated to Dobich that MULIC would assist him in identifying the customers most concerned and most likely to complain to the Commission. This second indication from MULIC also encouraged Dobich because Dobich had no way of knowing that other complaints about slow delivery were actually reaching the Commission.

The evidence as a whole fails to support the defendant's contention that all of its activities in relation to Dobich were solely for the purpose of assisting Dobich customers to get their stock. So far as MULIC knew, a report from MULIC to the Indiana Securities Commission would have been at least as effective in accomplishing MULIC's stated purpose as the method which MULIC actually selected. And before MULIC learned that Dobich's activities would benefit MULIC, MULIC had threatened to make such a report to the Commission. It is highly significant, therefore, that *after* MULIC had learned more about Dobich's activities, MULIC chose to follow a practice which, while consistent with the stated purpose of compelling Dobich to satisfy the complaints, was nevertheless much less likely to result in curtailment of Dobich's activities than a report to the Commission would have been. Moreover, if Schwanz and Sheets were as concerned about compelling Dobich to make deliveries within normal times as they claimed at trial, it is difficult to explain why neither of them ever instructed the stock transfer department to call future inquiries about slow delivery to their attention.

The defendant has argued that because most of the complaints about late delivery were ultimately satisfied, Dobich's activities were not a matter of serious concern, but the evidence discloses that this argument has no merit. The occurrences of slow delivery were clearly matters of great concern to Ralph Sheets when he wrote Dobich on September 28, 1964 that Dobich customers "might feel that MULIC is somehow responsible." At the time Sheets wrote that letter, he knew that shares had been delivered to three out of the four people who had complained, yet he viewed Dobich's practice of late delivery as a matter of great concern to MULIC. Certainly Sheets and Schwanz would not have required Dobich to explain his methods at a meeting on October 12 if they had not seen in those methods some cause for concern. Moreover, neither Sheets nor Schwanz made a practice of following up inquiries to see if the stock was delivered. It is clear, therefore, that Sheets and Schwanz saw no great distinction between unreasonably slow delivery and complete nondelivery. Both practices constituted "irregularities" to them.

Throughout the period of Dobich's activities, both Sheets and Schwanz knew that the Indiana Securities Commission had the power to revoke the license of a dealer such as Dobich. As a result of the Dellwo matter, Sheets and Schwanz had also been made aware of the Commission's attitude in regard to irregularities reported by the corporation whose stock was the subject of such irregularities.

During the period of Dobich's efforts in the market in relation to MULIC stock,

the market price of MULIC stock first rose substantially and then fell substantially. In the spring and early summer of 1964, the bid and asked prices fluctuated in the upper 60's and low 70's. In the summer and early fall the price began a steady increase. By the week of the meeting among Dobich, Sheets and Schwanz, October 12, 1964, the price had risen to 84 bid, 88.4 asked. By October 23, 1964, which is approximately when negotiations for the Illinois Mid-Continent merger began, the price had risen to 87 bid, 91.4 asked. The price reached a peak in late December 1964 of 93 bid, 97.4 asked. The price remained around 90 until about the time the Goddard telegrams were sent on March 8, 1965. The price dropped sharply during the week of March 12, and after a brief comeback it continued to decline throughout the spring and summer of 1965. On July 9, 1965, the day before Dobich died, the price was 66.4 bid, 68.4 asked. These prices are adjusted to reflect the 10% stock dividend effective March 31, 1965.

The greater weight of the evidence clearly indicates the Dobich's activities actually influenced the price of MULIC stock. It is of equal if not greater importance that MULIC's highest ranking officials *believed* that Dobich's activities were affecting the market for MULIC shares. Both Sheets and Schwanz were well aware of the price movements of MULIC stock. Schwanz understood the workings of the over-the-counter market for securities, and he knew as a result of the Dellwo matter that Dobich liked to "work one stock at a time." By October of 1964, Schwanz knew enough of Dobich's activities to know that he was "working" MULIC stock. By October, Schwanz suspected that Dobich was engaging in short sales, and he knew that an effort to "cover" short sales by purchases would result in upward pressure on the market price. Schwanz was acutely sensitive to MULIC's market price during the negotiations for merger with Illinois Mid-Continent, a proposed merger which was based primarily upon relative market prices and which de-

pended for its success upon maintenance of MULIC's market price at a level which it had only very recently attained.

For reasons which have been discussed here and elsewhere in this opinion, it is clear that MULIC's change in attitude toward Dobich Securities Corporation was for the purpose of preserving a high and stable market price for MULIC stock in order to gain certain advantages for MULIC.

This long and detailed account of MULIC's activities as they related to Dobich Securities Corporation has been necessary because only from an assimilation of a large number of small incidents can ultimate conclusions about MULIC's knowledge and conduct be derived. The unusual facets of this case will be observed in the unique facts and surrounding circumstances which have been disclosed by the evidence and not in any unusual application of legal principles. It is for this reason that an unusually long and detailed statement of facts has been required. No one incident or witness has provided a complete picture of the relevant facts and circumstances. An accurate understanding of MULIC's knowledge and conduct can be derived only from a chain of factors disclosed by many witnesses, exhibits, and stipulations. This case clearly demonstrates that the limits of duties prescribed by the Securities Exchange Act of 1934 " * * * cannot be confined to an abstract rule but must be fashioned case by case as particular facts dictate." Kohler v. Kohler Co., 319 F.2d 634, at 637–638 (7th Cir. 1963).

In Hawkins v. Merrill, Lynch, Pierce, Fenner & Beane, 85 F.Supp. 104 (W.D. Ark.1949), a case which resembles the instant case in some respects, the plaintiffs had purchased stock from a broker-dealer, D. S. Waddy, who never delivered the shares. Waddy maintained an account with the defendant brokerage firm through which he accomplished his fraudulent transactions. After discovery of the fraud, the plaintiffs sued the brokerage firm, alleging a violation of

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 of the Securities and Exchange Commission. The court held that the plaintiffs were entitled to recover. The court found that the defendant knew some of the details of Waddy's fraudulent conduct, but nevertheless permitted him to use his account with it without adequate supervision. The court also found that certain conduct of the defendant had helped prevent the Securities and Exchange Commission from discovering Waddy's fraudulent activities. While the facts of the instant case differ from those of *Hawkins,* the principle remains that certain conduct of MULIC encouraged Dobich's fraud and helped him conceal it. This conduct by MULIC constituted a "disregard [for] the rights of the public secured by the Securities Exchange Act of 1934." *Hawkins,* supra, 85 F.Supp. at 122.

There is no need to prolong this opinion by repeating the matters discussed in this court's order of September 23, 1966, 259 F.Supp. 673, which denied the defendant's motion to dismiss. It is significant to note that the basis of this court's holding—that liability might under some circumstances result from aiding and abetting a violation of Section 10(b) and Rule 10b–5—has continued to find acceptance in the courts. See Fischer v. Kletz, 266 F.Supp. 180 (S.D.N.Y.1967); Ross v. Licht, 263 F.Supp. 395 (S.D.N.Y.1967).

 As has been discussed, MULIC's liability in this case arises not from the express provisions of the Securities Exchange Act, but, rather, by implication from principles of the common law of torts which are applied in order to carry out the Congressional purpose. (An essential part of the common law of torts has always been the limitation that a tort-feasor is not liable for a loss unless his tortious conduct was a substantial factor in bringing the loss about. Restatement (Second) of Torts § 431 (1965).) This limitation has been recognized as applicable to cases of civil liability arising under the Securities Exchange Act of 1934. See Baird v. Franklin, 141 F.2d 238 (2d Cir. 1944), cert. den. 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591 (1944).

The *Baird* case characterizes this limitation as a requirement of "proximate cause." It is clear from the opinion that the element the Court found lacking in that case was a showing that the defendants' conduct had *in fact* caused the plaintiff's loss. The instant case presents this same problem of "causation-in-fact." Sometimes, for reasons of policy which are variously formulated, a defendant's conduct is held not to be the "legal cause" of the plaintiff's loss although his conduct was in fact a cause. An example is the rule of law applied in negligence cases in some jurisdictions that a defendant is liable only for those consequences of his acts which might reasonably have been anticipated as resulting from his acts. The losses in this case were precisely the kind of losses which would naturally be expected to result from the fraudulent acts of Dobich which MULIC aided and abetted. The instant case presents only the problem of determining what losses, if any, MULIC's conduct was *in fact* a substantial factor in bringing about.

( The defendant in the instant case contends that MULIC cannot be liable for any of the losses caused by Dobich's fraudulent conduct because these losses would have occurred even had MULIC not aided and abetted Dobich. This contention must be rejected as not supported by the evidence.)

As has been discussed, MULIC substantially encouraged Dobich by indicating to him on November 30 and December 1, 1964 that MULIC no longer intended to refer inquiries to the Indiana Securities Commission so long as particular complaints coming to MULIC were satisfied. In addition MULIC encouraged and assisted Dobich by indicating that future inquiries would be referred directly to Dobich rather than to the Commission.

Dobich's experience in connection with the Dellwo matter must have given him

reason to believe that the Commission could be quite effective, especially in response to letters of complaint coming from MULIC. It is especially noteworthy in this connection that after having been warned by the Indiana Securities Commission in connection with the Dellwo matter, Dobich did not again make use of the kinds of misrepresentations which the Commission at that time warned him against using. Dobich apparently feared the Commission enough to divert his energies into a somewhat different channel.

In view of his awareness of the powers of the Indiana Securities Commission and of the possible adverse publicity which might have accompanied a report of his activities by MULIC, Dobich must have viewed with alarm MULIC's threat to report him to the Commission once again. And indeed there is direct evidence of this alarm in Dobich's immediate response to Sheets' letter of September 28, 1964, a response in which Dobich asked for a personal meeting with two top MULIC executives. This meeting, as has been discussed, resulted in a renewal of MULIC's threat, in spite of Dobich's efforts to persuade MULIC to do otherwise. Nothing happened which might have allayed Dobich's fear that MULIC would report him until, on November 30 and December 1, 1964, MULIC sent to Dobich two communications that indicated MULIC was not going to do what it had previously said it would do. And of equal significance, Dobich could discern from these two letters a pattern of behavior on the part of MULIC which would enable him to deliver shares to those who complained to MULIC and thus also prevent them from going to the Commission. Armed with this new knowledge that, thanks to MULIC's change of attitude, disclosure to the Commission was much less likely, Dobich *continued* a fraudulent course of conduct that it is reasonable to infer from the evidence he would not otherwise have continued. In this manner MULIC's encouragement of Dobich contributed substantially to the losses of those members of plaintiff's class who purchased MULIC shares from Dobich on or after December 1, 1964, after MULIC had indicated a change in attitude to Dobich.

It of course cannot be said with absolute certainty that in the absence of encouragement from MULIC Dobich would have acted any differently than he did. But the answer to this is eloquently stated in Baird v. Franklin, supra, in which Judge Clark quoted with approval from Davis v. Garrett, 6 Bing. 716, 724, 130 Eng.Rep. 1456, 1459 (C.P. 1830),

> " 'But we think the real answer to the objection is, that no wrong-doer can be allowed to apportion or qualify his own wrong; and that as a loss has actually happened whilst his wrongful act was in operation and force, and which is attributable to his wrongful act, he cannot set up as an answer to the action the bare possibility of a loss, if his wrongful act had never been done. It might admit of a different construction if he could shew, not only that the same loss might have happened, but that it must have happened if the act complained of had not been done; but there is no evidence to that extent in the present case.' " 141 F. 2d at 245, 246.

Judge Clark's opinion in Baird v. Franklin, supra, was actually a dissent, but his general views on the requirement of "proximate cause" were shared by the majority. He dissented only as to location of the burden of proof.

It is clear from the evidence that Dobich took good advantage of the opportunity MULIC gave him by sending inquiries in his direction. In most instances where customers of Dobich were told by MULIC to contact Dobich, Dobich delivered the shares shortly thereafter.

On November 23, 1964, the president of MULIC learned that Dobich's fraudulent practices with regard to delivery of MULIC shares were continuing despite repeated warnings that MULIC would report his activities to the Indiana Securities Commission. At this point MULIC had available *at least* two

alternative courses of action with regard to Dobich. MULIC might then and there have reported what it knew of Dobich's activities to the Indiana Securities Commission. Or MULIC might have acted in a manner which had the effect of putting Dobich on notice that MULIC knew his activities were continuing and that MULIC did not intend to carry out its earlier threats. MULIC chose the second of these two alternatives. This clearly constituted substantial encouragement to Dobich.

Although not strictly necessary for the disposition of this case, it is appropriate to observe that even if MULIC had not encouraged Dobich by its communications to him of November 30 and December 1, 1964, MULIC also aided and abetted Dobich by its failure to report its knowledge of his fraudulent activities to the Indiana Securities Commission sometime shortly after November 23, 1964. If MULIC had not changed its attitude toward Dobich in an effort to protect the stability of the market for MULIC shares during the Illinois Mid-Continent merger negotiations and ensuing proxy fight, MULIC *would* have written to the Indiana Securities Commission sometime shortly after Schwanz learned of Dillon's complaint on November 23, 1964. This view is not only supported by the record in this cause—it is required by the testimony and reasonable inferences to be drawn therefrom under the unusual circumstances which existed. Moreover, it is clear from the evidence that MULIC had a duty to write such a letter to the Commission as it had clearly warned Dobich on October 12 and 13, 1964 that it would do. If MULIC had chosen to report its knowledge of Dobich's fraudulent activities to the Indiana Securities Commission, agency action would not have resulted in a curtailment of Dobich's activities until approximately December 21, 1964, as will be discussed below. However, MULIC did not report Dobich's activities. If recovery were denied to those members of plaintiff's class who purchased MULIC shares from Dobich on or after December 1, 1964, but before December 21, 1964, MULIC would benefit from the effect of a course of action which it wrongfully rejected.

The defendant, in regard to its failure to report Dobich, contends that a letter from MULIC to the Indiana Securities Commission would have had no effect because the Commission already knew from other sources as much as or more than MULIC knew. This contention is against the weight of the evidence.

There is an abundance of evidence that the Indiana Securities Commission did in fact know of Dobich's practice of slow delivery. No good purpose would be served by reviewing this evidence in detail. Although no letter from MULIC could in itself have added significantly to the Commission's knowledge of Dobich's activities, it does not follow from this that a letter from MULIC would not have precipitated administrative action. On the contrary, the only administrative action by the Commission which is disclosed by the evidence came in response to a single letter of complaint from MULIC recounting misrepresentations allegedly made to Mr. Dellwo. In response to this letter from MULIC, the Commission held a hearing, and after that hearing Dobich did not again engage in conduct of the particular kinds against which he had been warned. Thus, in response to a single letter of complaint from MULIC relating to the details of a single complaint, the Commission took action which proved to be effective. In view of this background, it can only be concluded that the Commission attached special significance to a letter of complaint coming from a company such as MULIC regarding activity in the market for its own shares. It is especially noteworthy in this regard that in his letter to Sheets of June 22, 1964, Deputy Commissioner Mote *asked* MULIC to report further irregularities.

Had such a letter from MULIC to the Indiana Securities Commission been written in the week following November 23, 1964, the Commission would have taken administrative action resulting in termination or significant curtailment of

Dobich's fraudulent activities. The process would not, of course, have been instantaneous. The Indiana Securities Commissioner, Martin K. Edwards, testified that a normal time period before a hearing once the Commission decided to hold a hearing was about 15 days. This is in fact approximately the time which elapsed between the Deputy Securities Commissioner's letter to Dobich regarding the Dellwo matter and the hearing which was held on that matter as a result of MULIC's letter in May of 1964. This court cannot determine with certainty the course that such a hearing might have taken or the action which would have resulted from such a hearing. If the Commission had examined the books or records of Dobich Securities Corporation which were then available, as the Commission clearly had the power to do, Dobich's license would have been suspended immediately. It is also possible that the warnings and publicity alone resulting from such a hearing might have forced Dobich to curtail his activities. This court cannot and need not determine with exactitude the manner in which administrative action by the Indiana Securities Commission would have affected Dobich. It is sufficient to observe that a letter from MULIC to the Indiana Securities Commission sometime in the week following November 23, 1964 relating a complaint or complaints of slow delivery or nondelivery by Dobich would have resulted in administrative action by the Commission culminating in a termination or significant curtailment of Dobich's fraudulent conduct no later than December 21, 1964.

Securities Commissioner Edwards and his deputy were succeeded in the office of the Indiana Securities Commission on December 1, 1964 by Thomas Jeffers and Donald Doxsee. However, Edwards remained until the latter part of December, assisting the new personnel and familiarizing them with the office. The fact that the Commission was in a period of transition during the critical weeks of December 1964 does not diminish the likelihood that the Commission would

have taken action against Dobich in response to a letter from MULIC. Such a letter, received early in December, would have caused Edwards to have reviewed the history of complaints about Dobich, including the Dellwo matter, with the new personnel, and such a review could only have resulted in some action or proceeding resulting in the prompt curtailment or termination of Dobich's fraudulent activities.

If in early December 1964 MULIC had revealed what it knew about Dobich to the United States Securities and Exchange Commission, an investigation would have immediately resulted and within two weeks after the start of such an investigation, Dobich's fraudulent activities would have been terminated.

This court holds, as previously indicated, that MULIC's affirmative conduct aided and abetted Dobich by providing substantial encouragement to him (and his organization) which resulted in losses to those members of plaintiff's class who purchased MULIC stock from Dobich on and after the date upon which the encouragement resulted in a continuation of Dobich's fraudulent conduct. Any determination of an exact date beyond which MULIC's conduct contributed substantially to the losses of purchasers of MULIC stock from Dobich lacks mathematical precision. However, there is no escape from the necessity to make such a determination. December 1, 1964 has been selected as the best and most realistic approximation indicated by the evidence. Under the facts and circumstances of this case, MULIC is liable to plaintiff and those members of plaintiff's class who purchased stock in MULIC from Dobich on or after December, 1964, but who did not receive delivery of the shares so purchased. Recovery by members of plaintiff's class is subject to the further terms and conditions of this and any further orders entered herein.

The class on whose behalf this action was brought by the plaintiff is so numerous that joinder of all members of

the class would have been impracticable. There are questions of law and fact common to the class, and plaintiff's claims are typical of the claims of the class. The plaintiff has fairly and adequately protected the interests of the class. The court finds that this action was maintainable as a class action under the provisions of Rule 23 of the Federal Rules of Civil Procedure. In its order denying the defendant's motion to dismiss the claim insofar as it was a class action, the court set forth in detail the reasons why a class action is appropriate in the instant case. 259 F.Supp. 673, at 683–684. Nothing in the record now before the court disturbs the finding that a class action is appropriate. The conditions which must be met in order for a member of the class to recover will be set forth.

Plaintiff's alleged class includes 419 individuals who claim losses totaling $2,104,904.75. However, only those members of the class who meet the conditions to be set forth, including the condition of a purchase of MULIC stock from Dobich on or after December 1, 1964, are entitled to recover. The total amount recovered will therefore presumably be substantially less than the total amount which has been claimed.

The plaintiff, Tora C. Brennan, who represented the class of plaintiffs in this action, purchased 321 shares of Midwestern United Life Insurance Company stock from Dobich Securities Corporation on April 9, 1965, for which she paid $22,470.00. She never received her stock. The defendant has presented no matters in defense to Mrs. Brennan's claim other than those which are applicable to all members of plaintiff's class. Mrs. Brennan is therefore entitled to recover from the defendant the sum of $22,470.00.

At the close of the plaintiff's case at trial, the defendant moved, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, to dismiss this action on the ground that plaintiff had not shown a right to relief. The court deferred its ruling on the motion. The motion is denied.

This memorandum contains the court's findings of fact and conclusions of law, as provided in Rule 52(a) of the Federal Rules of Civil Procedure.

## JUDGMENT

It is hereby ordered, adjudged and decreed that Tora C. Brennan, the named plaintiff herein, have and recover of and from the defendant the sum of twenty-two thousand four hundred seventy dollars ($22,470.00) and the costs expended herein both on her own behalf and on behalf of the other members of her class. This portion of the judgment in favor of Tora C. Brennan constitutes the entry of a final judgment pursuant to Rule 54(b), Federal Rules of Civil Procedure, as there is no just reason for delay, and this judgment shall bear interest at the rate of six per cent per annum from date of entry until paid.

It is further ordered, adjudged and decreed that each and all members of plaintiff's class who were such members on January 3, 1968, and who purchased stock in Midwestern United Life Insurance Company from Dobich Securities Corporation or any of its agents or sales representatives on or after December 1, 1964 and did not receive delivery of the stock so purchased, have and recover judgment of and from the defendant in the amount of their respective claims for the purchase price for stock not delivered as hereafter established before the special master to be designated by this court in its order of reference to be entered after consultation with counsel and subject to such individual defenses, if any, as the defendant shall establish before the special master in accordance with law. The manner of submitting all claims allowable under the terms of this judgment order and of filing individual defenses, if any, to a particular claim or claims shall be established in such order of reference to the master. The other matters concerning his appointment shall likewise be covered in such order, as required by Rule 53, Federal Rules of Civil Procedure. This portion of the judgment in favor of certain members of the

class is not a final appealable judgment as defined in Rule 54(a), Federal Rules of Civil Procedure, and will not become so until final judgment is entered after approval of the special master's report. No interest shall accrue prior to that date. Provided, however, that each of the individual judgments herein provided for shall be reduced by the sum, if any, which any class member entitled to recover under the terms of this order has received or hereafter receives from any of the Dobich bankruptcies by reason of a claim filed therein which is based upon the same loss for which recovery is provided in this judgment order. Provision shall be made for such adjustment, if any, by the special master as provided in the order of reference to be entered hereafter.

It is further ordered, adjudged and decreed that each and all members of plaintiff's class who were such members on January 3, 1968, and who purchased stock in Midwestern United Life Insurance Company from Dobich Securities Corporation or any of its agents or sales representatives on or before November 30, 1964 and did not receive delivery of the stock so purchased, take nothing by reason of this class action and plaintiff's complaint filed herein, and judgment is entered against each of them and in favor of the defendant. This portion of the judgment against certain members of the class constitutes the entry of a final judgment pursuant to Rule 54(b), Federal Rules of Civil Procedure, as there is no just reason for delay. Counsel for plaintiff and her class is directed to make copies of the judgment section of this Memorandum of Decision and Judgment and cause one such copy to be sent by regular United States mail to each member of plaintiff's class against whom this judgment is entered with a letter advising such class member of the date of entry of this judgment and that a notice of appeal must be filed within 30 days thereof to protect the right of appeal.

The matter of attorney's fees to be awarded to counsel for plaintiff and her class is expressly excluded from the terms of this judgment order and the question of attorney's fees to be awarded out of the funds recovered by class members shall be determined after further hearing and shall be set forth in the order of this court to be entered subsequent to the filing of the special master's report.